Filed 7/24/26  P. v. Hernandez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B337790 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA088222) |
| v. | |
| LEOBARDO HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark Arnold, Judge.  Affirmed.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2015, a jury convicted Leobardo Hernandez of the first degree murder of Juan Frias. The conviction was reversed on appeal due to instructional error. On remand, the People declined to retry Hernandez. The trial court reduced the conviction to second degree murder. Hernandez now appeals from the trial court's order denying his petition for resentencing under Penal Code section 1172.6.[1] After an evidentiary hearing, the trial court concluded the People proved beyond a reasonable doubt that Hernandez was guilty of second degree murder as a direct aider and abettor. Hernandez contends there was insufficient evidence to support this determination; the trial court erred in failing to consider his youth when determining whether there was evidence of malice; and the court further erred by failing to act as an independent fact finder. We find no prejudicial error and affirm.

---

[1]     All undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the law formerly codified at section 1170.95 as section 1172.6 for the remainder of this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Underlying Crime*[2]

"This case arises out of an August 6, 2010 gang-related shooting. Hernandez, a member of the South Los street gang, was riding in an SUV with two other South Los members, Javier Rodriguez, also known as 'Cricket,' and Daniel Rodriguez, also known as 'Tripper.' Tripper was driving and Hernandez was riding in one of the back seats. . . . They were driving near South Vermont Avenue and 111th Street in Los Angeles, an area contested by several rival gangs, looking for someone to retaliate against in response to the recent killing of a fellow South Los member." (*Hernandez, supra*, B266206.)

The group happened upon Frias. "Tripper stopped the SUV in front of Frias'[s] car because Frias looked like a member of a rival gang. Cricket then got out of the SUV, while Hernandez and Tripper stayed inside. Cricket approached Frias and asked him where he was from. When Frias did not answer, Cricket shot Frias in the face, killing him." (*Hernandez, supra*, B266206, fn. omitted.) Cricket used Hernandez's nine-millimeter Beretta handgun. "Cricket got back inside the SUV and told Hernandez

---

[2] We take judicial notice of the unpublished opinion from Hernandez's direct appeal. (Evid. Code, §§ 451, 459.) Based on our review of the trial transcripts, we find the factual recitation in the opinion from the direct appeal to be an accurate summary of evidence admitted at the trial. (*People v. Hernandez* (Oct. 4, 2016, B266206) [nonpub. opn.] (*Hernandez*); § 1172.6, subd. (d)(3); see *People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*) [appellate opinion is generally part of record of conviction in § 1172.6 proceedings].) We quote from it and recount additional facts from the trial transcripts.

and Tripper that he had 'got 'em.' " (*Hernandez, supra,* B266206.) They drove away.

### *Investigation, Trial, Verdict, and Direct Appeal*[3]

In June 2011, Toni Martinez, a detective with the Los Angeles County Sheriff's Department who was investigating Frias's murder, learned of three potential suspects: Tripper, Cricket, and Hernandez, all of whom were members of the South Los gang.

In September 2011, in an attempt to get Hernandez to talk about Frias's murder, Martinez placed Hernandez in a jail cell with two undercover deputies, Dylan Navarro and Anthony Castro, who posed as inmates as part of a *Perkins* operation.[4] Hernandez described the events of Frias's murder to the deputies. Their conversation was recorded.

In 2013, the People charged Hernandez by information with one count of murder. (§ 187, subd. (a).) The information further alleged that a principal personally and intentionally discharged and used a handgun, which proximately caused great bodily injury and death (§ 12022.53, subds. (b)–(d) & (e)(1)), and that the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).

At Hernandez's 2015 jury trial, Castro testified about his conversation with Hernandez during the *Perkins* operation. The

---

[3]     We take these facts from the trial transcripts and exhibits, which the trial court admitted into evidence at the evidentiary hearing.

[4]     A "*Perkins* operation" is when an undercover agent is placed in a cell with a suspect to obtain information from the suspect. (*Illinois v. Perkins* (1990) 496 U.S. 292.)

recording of the conversation was also admitted into evidence. In the recorded conversation, Hernandez told the undercover deputies the following:

When Frias was killed, Hernandez was with "two older homeys." Tripper drove the vehicle, which had tinted windows. Hernandez was in the backseat and did not get out. Only Cricket, the shooter, got out of the vehicle. Cricket asked Frias where he was from. When Frias did not answer, Cricket shot him once in the face. As Hernandez described it, "[Cricket] just got out, pop." When Cricket returned to the car, he said, "got 'em." Hernandez "had a .9 [Beretta]" that Cricket used to kill Frias. At some point that day, Hernandez had handled the weapon, but he did not load it.[5]

Hernandez, Tripper, and Cricket did not know Frias. They shot him because someone had "smoked" a "homey's" brother, and they believed that Frias was from an enemy gang.

When discussing whether the other two men would have spoken to police, Hernandez described Cricket as "cool," but said the other "fool," referring to Tripper, "did some bitch shit." Tripper "did a crack head move" and sold Hernandez's gun. Navarro asked if Hernandez gave the gun to the "homey" to sell or to get rid of it, and Hernandez responded, "No, that fool had it and he had sold it."

Hernandez and the undercover deputies further discussed how law enforcement had identified Hernandez. Castro brought up Hernandez's "homie," Cricket, and suggested the police could have convinced him to identify others involved in the shooting.

---

[5]     That Hernandez had touched the gun that day came up when the group discussed whether Hernandez's DNA was on anything linked to the crime.

Castro continued: "You said he's a homie though, right, like he's a G?  If he's a G, then you know he should be down.  It's just that other fool."[6]  Hernandez had previously referred to Tripper as the "fool" who sold the gun.  After saying, "It's just that other fool," Castro asked: "How come he got the gun?"  Hernandez answered: "He took it.  He just took it."  Castro clarified, "That was your shit though, right?" and Hernandez responded, "Yeah."  Castro asked again, "That was your fucken gun, he took your shit?"  Hernandez replied, "Yeah, yeah."

Castro testified about portions of the recording that were silent, but during which Hernandez had nodded.  Hernandez told the officers that a rival gang had "smoked [a] homey's brother.  So we wanted to, you know," and Castro replied, "re-yeah, retaliation."  Hernandez responded by affirmatively shaking his head.

Later, Castro asked Hernandez if they were "hunting," and Hernandez shook his head yes.  Castro also asked Hernandez if he "knew what was up" when he got in the car, and Hernandez again shook his head affirmatively.

Castro further testified to his understanding of the conversation: Hernandez told him Cricket used his gun; after the shooting "the driver, Tripper, took the gun and, in a crackhead move, sold it"; and Hernandez never indicated that he did not know the murder was going to occur.  Instead, he was out "hunting" and knew what would happen when he got in the car.

At trial, Los Angeles County Sheriff's Detective Albert Arevalo testified as the prosecution's gang expert.  Arevalo testified that gang members "put in work" for the gang by

---

[6]     At trial, Castro explained that by "G" he meant a "solid gangster.  Isn't gonna snitch."

committing crimes. Providing a firearm to another gang member qualifies as putting in work. The term "hunting" means going outside of a gang's boundary and "looking for rival gang members to commit assaults on them." If someone killed the sibling of a fellow gang member, the gang would usually retaliate violently. Hernandez and his two cohorts were all gang members.

Frias's friend, Rodrigo Torres, also testified. On August 6, 2010, Torres was at a gathering of friends when he saw Frias drive up and park his car in an alley. Torres heard arguing from the alley. He saw a white SUV with tinted windows parked in the alley. The SUV's passenger door was open, and a man was walking towards Frias's vehicle. The man was holding his right hand in front of his body near his stomach. Torres saw the man argue with Frias and then saw the man's right hand "go up." There was something shiny in the man's hand or at his wrist. Torres left to tell the others at the gathering that a man was arguing with Frias. As Torres spoke with his friends, he heard a gunshot. Torres and his friends "hit the floor" for safety and heard a door close and a vehicle "take off." Approximately 20 minutes later, Torres went into the alley and found Frias dead in his car, with a gunshot wound to his face.

The jury found Hernandez guilty as charged and found the gang and firearm allegations true. The court imposed a sentence of 50 years to life.

On direct appeal, a panel of this court held that under *People v. Chiu* (2014) 59 Cal.4th 155, "the trial court erred when it instructed the jury that it could convict Hernandez of first degree premeditated murder under a natural and probable consequences theory." (*Hernandez, supra*, B266206.) The court reasoned that "[a]lthough there was evidence from which the jury

7

could have found Hernandez guilty of first degree premeditated murder under direct aiding and abetting principles, the prosecutor relied on the natural and probable consequences doctrine at trial in arguing Hernandez's guilt." (*Hernandez, supra*, B266206.) Nothing in the record demonstrated beyond a reasonable doubt that the jury relied on a direct aiding and abetting theory, instead of the natural and probable consequences theory, in reaching its verdict. (*Hernandez, supra*, B266206.)

The court thus reversed and remanded the matter for the People to accept a reduction of the conviction to second degree murder or to retry Hernandez for first degree murder under a legally valid theory. On remand, the prosecution declined to retry Hernandez for first degree murder. The trial court reduced the conviction to second degree murder and imposed a sentence of 40 years to life.

### *Resentencing Proceedings*

In 2019, Hernandez filed a form petition for resentencing. The trial court denied the petition, finding it did not make a prima facie showing of eligibility for resentencing. Hernandez appealed. In 2022, a panel of this court reversed and remanded with instructions to issue an order to show cause and hold an evidentiary hearing. (*People v. Hernandez* (May 23, 2022, B307077) [nonpub. opn.].)

On remand, Hernandez's petition was assigned to Judge Amy N. Carter. In September 2023, Judge Carter held an evidentiary hearing, during which she took judicial notice of the trial transcripts and of four trial exhibits that were the transcripts of the recorded *Perkins* operation. After arguments by both parties, Judge Carter took the matter under submission.

8

However, in November 2023, without ruling on the petition, Judge Carter transferred the matter to Judge Mark S. Arnold, who had presided over Hernandez's original jury trial.

In April 2024, Judge Arnold conducted a further evidentiary hearing and denied the petition, finding Hernandez had the "intent to shoot and kill a rival gang member" and it was a "clear case of direct aiding and abetting."

Hernandez timely appealed.

## DISCUSSION

### I. Substantial Evidence Supports the Trial Court's Denial of the Petition

#### A. Senate Bill No. 1437 and section 1172.6

As relevant here, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015; Senate Bill No. 1437) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder. (*People v. Strong* (2022) 13 Cal.5th 698, 707–708; *Lewis*, *supra*, 11 Cal.5th at p. 957.) The bill amended section 188, requiring that to be convicted of murder, "a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

A principal in a murder, including an aider and abettor, may still be criminally liable if he or she personally possesses malice aforethought, whether express or implied. (*People v. Harris* (2024) 105 Cal.App.5th 623, 631; *People v. Silva* (2023) 87 Cal.App.5th 632, 639–640; *People v. Offley* (2020) 48 Cal.App.5th 588, 595–596 [Sen. Bill No. 1437 did not "alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator' "].)

9

Senate Bill No. 1437 also created "a procedural mechanism for those previously convicted of murder under a theory amended in [Senate Bill No. 1437] to petition for resentencing." (*People v. Emanuel* (2025) 17 Cal.5th 867, 880 (*Emanuel*); see also *Lewis*, *supra*, 11 Cal.5th at p. 959.) If a defendant files a petition setting forth a prima facie case that he or she could not be presently convicted of murder because of changes to the law implemented by Senate Bill No. 1437, then the trial court must issue an order to show cause. (*Emanuel*, at p. 880; § 1172.6, subd. (c).)

Then, " 'the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under state law as amended by Senate Bill No. 1437 . . . .' " (*People v. Njoku* (2023) 95 Cal.App.5th 27, 41; § 1172.6, subd. (d)(1), (3).) At the hearing, the trial court sits as "a fact finder tasked with holding the People to the beyond a reasonable doubt standard." (*People v. Clements* (2022) 75 Cal.App.5th 276, 294–295.)

### B.  Standard of review

We review a trial court's order after an evidentiary hearing for substantial evidence. (*Emanuel*, *supra*, 17 Cal.5th at p. 885.) " 'We " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.' " [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt

standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' [Citations.]" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480 (*Oliver*).) Our substantial evidence review includes circumstantial evidence and reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We may reverse the trial court's order only if it is clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]" ' . . . ." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

> **C.      There was substantial evidence of direct aiding and abetting with both express and implied malice[7]**

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) "A deliberate intent to kill constitutes express malice. (§ 188, subd. (a)(1).) Implied malice is defined as acting without provocation or with an 'abandoned and malignant heart' (§ 188, subd. (a)(2)), which a long line of cases has interpreted as acting with a conscious disregard for life." (*People v. Morris* (2026) 19 Cal.5th 671, 678.)

"The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.) "[I]t is well settled that intent to kill or express malice . . . may in many cases be inferred from the defendant's acts and the

---

[7]      The trial court found the People proved Hernandez was a direct aider and abettor without stating whether this finding was based on express or implied malice. We consider both theories.

11

circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*).)  Implied malice murder requires that the killing be proximately caused by an act, " ' " 'the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)  Proximate causation requires the act to have been a substantial factor contributing to the death. (*Ibid.*)

An aider and abettor's guilt is "based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).)  "A person aids and abets the commission of a crime when [the person], (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

Thus, to establish a defendant is guilty of express malice murder as a direct aider and abettor, the prosecution must prove beyond a reasonable doubt that the defendant aided, promoted, encouraged, or instigated a killing while knowing and sharing the perpetrator's intent to kill.  (*McCoy*, *supra*, 25 Cal.4th at p. 1118.) "Express malice does not mean an intent to kill a *specific person*; it is defined as the intent to unlawfully kill *a* person." (*People v. Nguyen* (2024) 103 Cal.App.5th 668, 679.)

To establish a defendant is guilty of implied malice murder as a direct aider and abettor, the prosecution must prove beyond

12

a reasonable doubt that the defendant aided the perpetrator's commission of a life-endangering act with the "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life," and the aider and abettor must act "in conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713, italics omitted, cited with approval by *Reyes*, *supra*, 14 Cal.5th at p. 991.)

### 1. Acts of aiding and abetting

Viewing the evidence in the light most favorable to the trial court order, the record contains substantial evidence that Hernandez aided, promoted, or encouraged the commission of the murder. He got into a car with two other gang members with the express purpose of retaliation. A fellow gang member's brother had been shot and Hernandez indicated the group's express purpose was to "hunt" a rival gang member. In this context, Hernandez supplied the murder weapon. A reasonable fact finder could conclude based on these facts, beyond a reasonable doubt, that Hernandez engaged in conduct that aided, promoted, or encouraged the commission of the crime.

Hernandez contends that any inference that he handed over his gun to Cricket for the shooting is "not solidly based on the evidence and so cannot support the trial court's ruling." We disagree. Hernandez told the deputies it was his gun and that he handled it the day of the shooting. In recounting the incident, he did not make any negative statements about Cricket using the gun to shoot Frias. Instead, he was only angry or disdainful that Tripper sold the weapon after the shooting. Hernandez claimed to know "Cricket's cool," but described Tripper as "that other fool," who "did some bitch shit" and, in "a crack head move," sold

13

the gun. Castro asked, "How come [Tripper] got the gun?" and Hernandez replied, "He took it. He just took it." Because it is undisputed that Cricket was the shooter, there is a reasonable inference that when Tripper "took" the gun to sell it, this was *after* the shooting. Indeed, this was consistent with Castro's testimony about the conversation, in which he said that Hernandez told him that after the shooting, Tripper took the gun and sold it. Hernandez repeatedly affirmed the gun was his, and, while he was free in his criticism of Tripper for taking the gun and selling it, he at no point told the officers that Cricket had taken the gun without his permission or that he did not want it to be used in the shooting.

The lack of direct evidence that Hernandez willingly gave Cricket his weapon for the shooting does not mean there is a lack of substantial evidence to support the trial court's findings. " ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

### 2. Express malice

The record also contains substantial evidence that Hernandez shared Cricket's intent to kill. When Hernandez got into Tripper's car, he knew they planned to retaliate for the killing of another gang member's brother. (*Smith*, *supra*, 37 Cal.4th at p. 741 ["evidence of motive is often probative of intent to kill"].) According to the gang expert, this would mean to retaliate violently. Hernandez nodded "yes" when asked if he "knew what was up" when they got in the vehicle. Cricket got out

14

of the car and quickly shot Frias because they thought he was from the enemy gang.  Hernandez also confirmed the men were out "hunting."  Although it was Castro who used the term "hunting," and Hernandez merely agreed, the description was consistent with what Hernandez explained in his own words:

> "Castro: In the daytime?  Damn, homey.  You guys just fucking rolled up on him real quick and busted—

> "Hernandez: Yeah.  Because . . . [¶] . . . [¶] they had smoked another homey.

> [¶] . . . [¶]

> "Navarro: Your homey smoked some other fool before that?

> "Hernandez: No, they smoked the homey's who brother.  So we wanted to, you know.

> "Castro: Re-yeah, retaliation.

> [¶] . . . [¶]

> "Castro: Damn, homey.  Do you think this fool was from the other neighborhood or what?  Mira—

> "Hernandez: No.

> "Castro: It was just one of those fucking—

> "Hernandez: We thought he was enemiga (enemy).

> "Castro: Huh?

> "Hernandez: We thought he was enemiga (enemy).

> "Castro: Oh."

In addition, after the shooting, Cricket said, "got 'em," suggesting that a killing—not something more minor—was part of the plan.  Hernandez supplied the gun, a predictably highly deadly weapon.  The inference that Hernandez knew Cricket

15

intended to kill a rival gang member that day was reasonable.  It was not necessary for Hernandez to state that he knew a rival would be killed.  (*Smith*, *supra*, 37 Cal.4th at p. 741 [express malice may in many cases be inferred from the defendant's acts and the circumstances of the crime].)  This evidence supported the trial court's finding that Hernandez participated in a plan to kill a rival gang member with the intent to kill.

### 3.    Implied malice

Further, the evidence was also sufficient to support the conclusion that Hernandez acted with implied malice.  If, as Hernandez contends, the evidence only establishes that he intended to retaliate "violently" and "assault" another gang member, and not specifically to kill, there was substantial evidence that Hernandez knew his conduct of giving the gun to Cricket, and participating in the retaliatory hunt for a rival gang member with a gun, endangered the victim's life, and that he acted with conscious disregard for life.  The use of a firearm was foreseeably dangerous to human life.  (See *People v. Cravens* (2012) 53 Cal.4th 500, 510–511 [punch to victim's head was predictably dangerous to human life]; *People v. Schell* (2022) 84 Cal.App.5th 437, 443 [evidence of implied malice where defendant knew he was aiding violent group attack on victim and knew bat and shovel were being used on victim].)

In addition, Hernandez and two others drove up in a car and shot Frias, a stranger, unprovoked, while Frias was alone in his vehicle.  Factors such as the "victim's vulnerability, the number of assailants, the ferocity and duration of the attack, and the unusualness or unexpectedness of the victim's death," support the malice finding.  (*People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 502.)  Frias was alone,

16

the shooting was sudden, and he would not have expected it. Hernandez was present before and during the crime. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599 ["It is well settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, including flight, are relevant to determining whether a defendant aided and abetted in the commission of the crime."].) Hernandez and the two other men also immediately fled and did not attempt to help Frias. Failing to assist a wounded victim may manifest "a callous indifference to human life." (*People v. Palomar* (2020) 44 Cal.App.5th 969, 978.)

*Reyes* is instructive. In *Reyes*, the 15-year-old defendant was in a park with other gang members. (*Reyes*, *supra*, 14 Cal.5th at p. 985.) One person showed the group a gun he was carrying. (*Ibid*.) A few hours later, Reyes and some of the other gang members left the park and biked to the edge of a rival gang's territory. (*Ibid*.) They called out for a passing car to stop, chased after it, and attempted to encircle it. (*Ibid*.) Someone fired a single shot at the car's driver, killing him, and the riders fled in different directions. (*Ibid*.) Reyes was convicted of second degree murder. (*Id*. at p. 986.) Years later, a trial court denied his resentencing request after an evidentiary hearing, finding him guilty beyond a reasonable doubt of implied malice murder, and the Court of Appeal affirmed. (*Id*. at p. 987.)

The California Supreme Court reversed. (*Reyes*, *supra*, 14 Cal.5th at p. 992.) It first held that there was no evidence that Reyes's conduct—biking to a rival gang territory with other gang members—was a " 'substantial factor' " that proximately caused the victim's death. (*Id*. at pp. 988, 989.) It held that "acts that merely create a dangerous situation in which death is possible

17

depending on how circumstances unfold do not, without more, satisfy this causation requirement. There was no evidence that Reyes's acts precipitated or provoked the shooting. And there is no reason to believe that the killing of [the victim] would not have occurred if Reyes had not accompanied his fellow gang members on the ride or participated in the chase." (*Id*. at p. 989.)

Here, like Reyes, Hernandez was not the shooter. However, unlike Reyes's conduct, Hernandez's "acts precipitated or provoked the shooting." (*Reyes*, *supra*, 14 Cal.5th at p. 989.) Hernandez supplied the murder weapon and joined the shooter in a car with the express purpose of finding a rival gang member to shoot.

The *Reyes* court also determined that the trial court misunderstood the law as to the mens rea requirement. By relying on the jury instruction for implied malice murder without reference to the elements of direct aiding and abetting, the trial court failed to evaluate Reyes's mental state concerning the life-endangering act committed by the direct perpetrator. (*Reyes*, *supra*, 14 Cal.5th at p. 992.) "[T]he trial court did not appear to recognize that implied malice murder requires, among other elements, proof of the aider and abettor's knowledge and intent with regard to the *direct perpetrator's* life endangering act." (*Id*. at p. 991.) The *Reyes* court explained that "[h]ere, assuming the life-endangering act was the shooting, the trial court should have asked whether Reyes knew that Lopez intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Id*. at p. 992.)

In this case, there was substantial evidence of each of these factors. The trial court could reasonably conclude that

18

Hernandez knew Cricket intended to shoot a rival gang member. The group was out hunting in retaliation for a killing; they had brought a gun; and Cricket said, "got 'em," suggesting that shooting a rival gang member was the plan. There is also evidence that Hernandez intended to aid Cricket in the shooting because he provided the murder weapon, and there was no indication he was angry that Cricket used his gun or that he was surprised by Cricket doing so. The trial court could reasonably conclude that Hernandez had knowledge of Cricket's intent, he intended to assist him in his life-endangering act of using a gun to retaliate against a person they believed was an enemy, and that Hernandez acted in conscious disregard for life.

Substantial evidence supported the trial court's finding that the People established Hernandez was guilty of second degree murder as a direct aider and abettor acting with either express or implied malice.

## II. Hernandez Forfeited His Argument that Youth Diminished His Culpability and He Has Not Established Ineffective Assistance of Counsel

Hernandez was 19 years old at the time of the murder. He contends his youth was relevant to whether he acted with malice, and the trial court erred by not expressly considering his age when ruling on the petition. Hernandez concedes, however, that he did not raise this argument in the trial court. The argument is forfeited. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) In April 2024, when the trial court ruled on the petition, the law was no longer unclear as to the relevance of youth in the evaluation of whether a youthful offender harbored the requisite mental state. (*People v. Pittman* (2023) 96 Cal.App.5th 400, 416–417 (*Pittman*) [it could not be presumed that the trial court

19

implicitly considered youth where defendant's age of 21 years was not raised below, and the court denied the petition *before* appellate courts decided the question]; *Oliver, supra*, 90 Cal.App.5th at p. 488 [declining to find forfeiture where resentencing petition was denied in December 2020].)

There were multiple published cases concluding that youth is a relevant factor bearing on mental state in section 1172.6 petitions. (*People v. Jimenez* (2024) 103 Cal.App.5th 994, 1004 [discussing pre-2024 history of considering youth in § 1172.6 petitions]; *Pittman, supra*, 96 Cal.App.5th at pp. 416–418.) There were also several cases considering the youth of petitioners similar in age to Hernandez at the time of the crime, and cases concluding youth is a factor to be considered when determining whether the evidence demonstrated malice. (See, e.g., *Pittman*, at p. 417; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 595 [18 years old at the time of the underlying offense].)

Hernandez contends that should this court find the argument forfeited, his trial counsel was ineffective for failing to raise the issue in the trial court. Yet, to establish ineffective assistance of counsel, Hernandez must establish both (1) that trial counsel's failure to raise an argument regarding his age fell below an objective standard of reasonableness under prevailing professional norms, and (2) the failure was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

Hernandez has not established prejudice.[8] "[P]rejudice must be affirmatively proved. [Citations.] 'It is not enough for

---

[8] Because Hernandez has not established prejudice, we need not determine whether his trial counsel's performance was deficient. (*Strickland, supra*, 466 U.S. at p. 697 [no need "to

20

the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.)

As a Court of Appeal recently stated in considering youth in the context of a section 1172.6 sentencing petition: "[T]he case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*Oliver*, *supra*, 90 Cal.App.5th at p. 489.) Hernandez does not identify any evidence in the record that his youth diminished his culpability or that his behavior was motivated by either of these factors. He merely points to his age of 19 and the fact that Cricket and Tripper were older.[9] However, Hernandez does not cite any evidence of peer pressure.

Additionally, there was also substantial evidence of Hernandez's intentional acts. There is evidence Hernandez knew the plan was to travel to rival gang territory to retaliate for a death and that he provided the gun. There is no evidentiary basis to conclude that we are "presented with a situation where a youthful offender was swept up in circumstances beyond his or

---

address both components of the inquiry if the defendant makes an insufficient showing on one"].)

[9] Hernandez was born in 1991. Cricket was born in 1974. Tripper was born in 1982.

her control that led to an unintended death." (*Oliver*, *supra*, 90 Cal.App.5th at p. 489; see *In re Harper* (2022) 76 Cal.App.5th 450, 467–472 [denying habeas corpus petition because defendant's youth, even if relevant under felony-murder implied malice analysis, did not mitigate his culpability because the evidence showed he knew the plan was to kill victim].) The evidence demonstrated that the shooting of a rival gang member was preplanned, and there is no evidence that Hernandez was an unwilling or impulsive participant.

In sum, Hernandez has not established ineffective assistance of counsel due to trial counsel's failure to argue the trial court should consider his age in ruling on the resentencing petition.

## III. The Record Does Not Establish That the Trial Court Failed to Act as an Independent Fact Finder

Hernandez contends that because the trial court asked whether the matter was on calendar for a prima facie determination, and also said it remembered the case, the court relied only on its memory and failed to act as an independent fact finder. The record does not support this contention.

### A. Background

In April 2024, after several continuances, the parties appeared for the evidentiary hearing before Judge Arnold. At the beginning of the hearing, the trial court and counsel had the following brief exchange:

"The Court: Is this Leobardo Hernandez?

"[Defense counsel]: Yes, your honor.

"The Court: This is Leobardo Hernandez, YA088222. The case is here for—isn't it to determine a prima facie—

22

"[Defense counsel]: It's here for the—

"The Court: The evidentiary hearing?

"[Defense counsel]: Yes.

"The Court: Because I'm missing the minute orders. [¶] All right. [To the prosecutor:] Do you have something you want to present?

"[Prosecutor]: So I've submitted to the court the trial transcripts in this matter.

"The Court: Right."

The prosecutor reminded the court that he had submitted the recordings from the *Perkins* operation into evidence, at Judge Carter's request. The court then heard the parties' arguments. At one point, when defense counsel mentioned his evidentiary briefs, the court referenced the date of one of the briefs and said, "I looked at that—yes, you're right." The parties did not present any new evidence during the hearing.

At the end of the hearing, the trial court stated the reasons for its ruling. The court began by saying it remembered the case and then recited specific facts. For example, it stated that Hernandez provided the gun to the shooter, and Hernandez indicated that he knew what was going to occur when he got into the car. The court found beyond a reasonable doubt that Hernandez had directly aided and abetted the murder and denied the petition.

## B. The trial court is presumed to have followed the law

At the evidentiary hearing on a section 1172.6 petition, the "trial court acts as an independent fact finder to determine whether the prosecution has met its burden . . . ." (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 457; accord, *People v.*

*Guiffreda* (2023) 87 Cal.App.5th 112, 123.)

The trial court's statements at the hearing do not establish that it failed to act as an independent fact finder. The court held the evidentiary hearing after several continuances. That it opened the hearing by asking if the case was before it "to determine a prima facie," does not show that it misunderstood its task or was unprepared. The trial court quickly corrected itself and responded, "right," when reminded of the evidence in the record. The court expressly referred to having looked at one of the evidentiary hearing briefs. That the court did not also expressly state that it had reviewed the submitted trial transcripts does not permit us to presume it did not.

Moreover, while the trial court said it remembered the case, it also recited numerous factual details from the trial evidence and did not state or otherwise suggest that it was relying solely on its memory of the trial. The record does not establish that the trial court failed to act as an independent fact finder. (See, e.g., *People v. Martinez* (2025) 108 Cal.App.5th 329, 338 [judge's "mere statement, apparently in error, that she heard the testimony at the original trial does not by itself demonstrate she based her ruling on her memory of [the] testimony [at a co-defendant's trial] from more than a decade earlier"].)

Without such evidence, we do not presume trial court error. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042 ["Absent evidence to the contrary, we presume that the trial court knew the law and followed it."]; *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913 [we presume official duty was regularly performed and trial court followed established law]; Evid. Code, § 664.)

24

## DISPOSITION

The order denying Hernandez's petition for resentencing is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:


EGERTON, Acting P. J.


KARNOW, J.*

---

\*     Retired Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.